Drake, Ch. J.,
delivered the opinion of the court:
On the 15th of December, 1870, the claimant, then major 45th U. ,S. Infantry, was on duty as disbursing officer of the Bureau of Befugees, Freedmen, and Abandoned Lands for the State of Kentucky; which duty he had been performing, under military orders, for more than three years prior to that date.
On that day he was, by order of the President, placed on the retired list as major, but continued to perform that duty until the autumn of 1872, when he was arrested for trial before a *406 general court-martial, appointed by direction of the President and convened at Louisville, Ky.
Before that court the claimant was arraigned' and tried on two charges, — I. “Violation of the act of Congress approved March 2,1863, chapter 67, section 1; ” and II. “ Conduct unbecoming an officer and a gentleman.”
He was found guilty, October 14, 1872, of both charges, and was sentenced by the court to be cashiered, to pay a fine, and be imprisoned in a penitentiary for the period of four years.
The proceedings, findings, and sentence of the court-martial were transmitted to the Secretary of War, who wrote upon the record thereof the following order:
“ The proceedings in the foregoing case of Maj. Benjamin P. Runkle, retired, United States Army, are approved with the exception of the action of the court in rejecting as evidence a certain letter written by a witness for the prosecution, and offered to impeach his credibility, also in unduly restricting the cross-examination of the same witness in relation to the motives influencing his testimony.
“ Inasmuch, however, as in the review of the case it was determined that the whole testimony of this witness could be excluded from consideration without impairing the force of the testimony for the prosecution, upon which the findings rest, the erroneous action of the court in this respect does not affect the validity of the sentence.
“The findings and sentence are approved.
“In view of the unanimous recommendation by the members of the court that accused shall receive Executive clemency on account of his gallant services during the war, and of his former good character, and in consideration of evidence by affidavits presented to the War Department since his trial, showing that accused is now, and was at the time when his offense was committed, suffering under great infirmity in consequence of wounds received in battle; and credible representations having been made that he would be utterly unable to pay the fine imposed, the President is pleased to remit all of the sentences except so much thereof as directs cashiering, which will be duly executed.
“Wi. W. Belknap,
“ Secretary of War.”
On the 16th of January, 1873, the War Department issued General Order No. 7, announcing the sentence of the court, and that from that date the claimant ceased to be an officer of the Army.
From the date of this order till after August 4, 1877, the claimant’s name was not bhrne on the Army Register.
*407 On the last-named date President Hayes made the Executive order set forth in finding Y, disapproving the conviction and sentence of the court, and directing that the- said General Order No. 7 should be revoked.
From the date of this order to January 1, 1884, the claimant has drawn pay as a retired major, to the total amount of $23,585.62; of which $9,195.27 was paid him August 15,1877, for the period from January 16, 1873, the date of General Order No. 7, to the 4th of August, 1877, the date of President Hayes’s order.
Upon the facts thus stated in condensed form, but which are more fully set forth in the findings, have arisen the questions which have been submitted for our decision.
The claimant sues for longevity pay, basing his claim on the decision in Tyler’s Case (16 C. Cls. R., 223; 105 U. S. R., 244).
His contention is, that he was not, in law, at any time, out of the Army. In support of this position he takes the following grounds:
I. That the court-martial before which he was tried was not lawfully appointed, and therefore had no jurisdiction to try him.
II. That even if lawfully appointed, it had no jurisdiction of the charges and specifications alleged against him.'
III. That the sentence of the court-martial was never confirmed by the President.
IY. That the sentence was disapproved, and the War Department’s order No. 7 revoked, by the order of President Hayes; which it is claimed was the only Presidential action ever had on the proceedings of the court.
We will consider these propositions in their order.
I. That the court-martial ivas not lawfully appointed. If this position be sustained, then, of necessity,'the whole proceedings of the court were unlawful, and had no effect to remove the claimant from the Army.
The sole ground taken in support of it is, that the court was appointed by the President, when it should have been appointed b.y a “ general officer commanding the Army of the United States, a separate army, or a separate department.”
■To sustain this position the claimant relies on the 72d Article of War, as found in the Revised Statutes; bat that Article has no bearing on this case, because it was not in existence when the court-martial was convened, but came into force in *408 the Revised Statutes^ June 22,1874. The substance of it was in force, but not in those words, when the court was held that tried and sentenced the claimant. We must therefore go back of that time to find the exact terms of the law A^hich then existed.
In the act of April 10, 1806, “ for establishing Bules and Articles for the government of the Armies of the United States ” (2 Stat. L., 359, ch. 20), was established, for the first time after the adoption of the Constitution, a body of such rules and articles, among which was the following:
Article 65. Any general officer commanding an army, or colonel commanding a separate department, may appoint general courts martial, whenever necessary. But no sentence of a court martial shall be carried into execution until after the whole proceedings shall have been laid before the officer ordering the same, or the officer commanding the troops for the time being; neither shall any sentence of a general court martial, in time of peace, extending to the loss of life, or the dis-mission of a commissioned officer, or which shall, either in time of peace or war, respect a general officer, be carried into execution, until after the whole proceedings shall have been transmitted to the Secretary of War, to be laid before the President of the United States, for his confirmation or disapproval, and orders, in the case. All other sentences may be confirmed and executed by the officer ordering the court to assemble, or the commanding officer, for the time being, as the case may be.”
This article remained unchanged until May 29, 1830, when an act was passed to alter and amend it (4 Stat. L., 417, ch. 179), as follows:
“ Sec. 1. Whenever a general officer commanding an army, or a colonel commanding a separate department, shall be the accuser or prosecutor of any officer in the army of the United States, under his command, the general court-martial for the trial of such officer shall be appointed by the President of the United States.
u Sec. 2. The proceedings and sentence of the said court shall be sent directly to the Secretary of War, to be by him laid before the President for his confirmation, or approval, or orders in the case.
“ Sec. 3. So much of the sixty-fifth article of the first section of the ‘ act for establishing rules and articles for the government of the armies of the United States,’ passed on the 10th of April, 1806, as is repugnant hereto, be, and the same is hereby, repealed.”
*409 Article 65 and this act were in force when the court-martial was appointed and when it sat, and they continued in force, as a part of the Revised Statutes, until superseded by Article 72.
Had they been before the claimant’s counsel at the argument, he would, we suppose, have taken the same position that he took in reference to Article 72, namely, that, aside from the act of May 29,1830, the President had no authority to appoint a court-martial under any circumstances. In our opinion such a position cannot be maintained.
By the Constitution the President is the commander-in-chief of the armies of the United States. Courts-martial are the creatures of orders; the power to convene them being an attribute of command. As commander-in-chief the President is authorized to give orders to his subordinates, and the convening of a court-martial is simply the giving of an order to certain officers to assemble as a court, and, when so assembled, to exercise certain powers conferred upon them by the Articles of War. If this power could not be exercised, it would be impracticable, in the absence of an assignment of a general officer to command the army, to administer military justice in a considerable class of cases of officers and soldiers not under the command of any department commander, as, for example, a large proportion of the officers of the general staff, and the whole body of the retired officers. The authority of the President to appoint general courts-martial has, in fact, been exercised, from time to time, from an early period, in a series of cases, commencing with those of Brigadier-General Hull, Major-General Wilkinson, and Major-General Gaines, tried in 1813-1816, and including that of Brevet Major-General Twiggs, tried in 1858. (Winthrop’s Digest, 200,388; Ives’s Military Law, 30.)
Our opinion then is, that the President’s order appointing the court that tried the claimant was a lawful order, and therefore that the first point of objection raised by the claimant against the action of that court is untenable.
II. The second point is, that even if the court was lawfully appointed, it had no jurisdiction of the .charges and specifications on which the claimant was tried. If this be so, then the whole proceedings of the court were a nullity, and the claimant never was put out of the army.
*410 Two grounds were taken at the argument in support of this position. The first was, that the charges upon which the claimant was tried did not constitute a “ case arising in the land or naval forces; ” and as the Constitution limits the juristion of courts-martial to cases so arising; and as the offense charged must be military in its nature, and committed while in the military service; and as the claimant’s duties while connected with Bureau were purely civil; and as that Bureau wa's not a branch of the military service; therefore the court had no jurisdiction of the charges. These are positions which should be carefully considered.
And first, as to the constitutional question. Article V of the Amendments to the Constitution declares that—
“ No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger.”
Can this be regarded as a limitation upon the jurisdiction of courts-martial ? We are quite unable to see it in that light. On the contrary, is it not, in effect, an express constitutional affirmation and preservation of the unlimited right of administration of military justice through military tribunals, without the agency of grand juries % It so seems to us.
The great and fundamental proposition of that amendment is, that “ no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury.”
Standing alone, that would have extended to crimes of those descriptions committed in the Army or Navy; and no officer or man, in either service, could ever haAre been tried for such a crime, “ unless on a presentment or indictment of a grand jury.” From this would have resulted, beyond question, great confusion and serious obstruction of justice.
To avoid that was, doubtless, the very intent of adding the words “ except in cases arising in the land or naval forces.” The effect of those words is very plain. It is as if the constitution had, in terms, said, that as to such cases in those forces, whether of “ capital or otherwise infamous crime,” or of any lower grade of offense, no presentment or indictment of a grand jury shall be necessary, and they shall be dealt with according to military *411 law. Hence that amendment, instead of' limiting the jurisdiction of courts-martial, leaves it to be exercised to the fullest extent, under such “rules for the government and regulation of the land and naval forces ” as Congress might, under the power given to it by the Constitution, see fit to prescribe.
So far then as the constitutional point is concerned, we are of the opinion that it has no relevancy to the question of the jurisdictional right of the court over the subject-matter of the charges on which the claimant was tried, except to sustain that right.
But in this connection the claimant contends, that the offense for which he could be lawfully tried before a court-martial must have been military in its nature, and that his employment in time of peace, upon purely civil duties in connection with the bureau, though under military orders, did not subject him to the jurisdiction of a court-martial.
In considering this point the first thing to be ascertained is whether the orders under which he performed those duties were authorized by law.
■ March 3,1885, was passed the "Act to establish a Bureau for the relief of Freedmen and Refugees” (13 Stat. L., 507, ch. 90). In section 3 of that act is this sentence:
“And any military officer may be detailed and assigned to duty under this act without increase of pay or allowances.”
This is all that the act contains in regard to military officers. There is in it no attempt to distinguish between military and civil duties, nor any specification of what kinds of duty such -officers might be required to perform; but the broad authority to assign them “ to duty under this act ”; that is, to any duty which the act authorized to be performed by any one. The claimant obeyed the order given him to report for duty in the Bureau, and he remained on duty there from April, 1867, to the autumn of 1872, when he was arrested for trial, — a period of more than five years, without, so far as appears, ever objecting that he was unlawfully assigned to that duty. Not only so, but he submitted to trial on charges alleging offenses committed while on that duty, without, so far as shown, once urging in defense that his duty in the Bureau was civil and not military, and therefore that the court had no jurisdiction to try him under those charges. Had he attempted such a defense, the answer might have been fourfold: 1. That the question was not *412 whether the services he rendered while on that duty were, as now contended, purely civil and clerical, but whether they were rendered by him as a military officer, acting under lawful military orders: 2. That whatever service a military officer is lawfully ordered by his superior officer to perform is, in the eye of the law, a military service, though when performed by a private citizen, under the employment of others, it would be a purely civil service. It is the military character of the officer, acting under lawful military orders, which makes the duty a military one, whatever may be the particular description of work involved in the performance of that duty: 3. Whether the duty he was assigned to was military or civil, had no bearing on the question of the jurisdiction of the court over the subject-matter of the charges and specifications preferred against him, alleging offenses committed by him while on duty. If he had set up as a bar to the jurisdiction of the court, that the order assigning him to duty in the Bureau was unlawful, he would have been rightly informed, we doubt not, that that was a matter of defense against the charges, and had no connection with the question of the court’s jurisdiction: 4. That whether, while on duty, he was performing one kind of work or another, he was liable as a military officer to answer the charges.
In our judgment, the objection to the jurisdiction of the court-martial, based on the supposed non-military character of the services performed by the claimant in the Bureau, has no foundation in law or reason.
The remaining objection to the jurisdiction of the court of the subject-matter of the charges, is based on the fact that the acts constituting the offenses charged against him were done by him while he was on duty after the expiration of thirty days from the passage of the Act of January 21,1870 (16 Stat. L., 62, ch. 9), providing—
“ That no retired officer of the Army shall hereafter be assigned to duty of any kind, * * * and all such assignments heretofore made shall terminate within thirty days from the passage of this act.”
The claimant insists that his retention on duty in the Bureau after he was put on the retired list, December 15, 1870, was in plain violation of that act; that his duties, after that day, were illegally forced upon him; and that misconduct and offenses committed in the performance of duties illegally imposed do *413 not subject a soldier, even in actual service, to tbe jurisdiction of courts-martial.
The first question here is, whether his retention on duty in the Bureau was, in fact, a violation of that law. Without undertaking to pass definitively on that point, we are content with simply noting the fact that the law does not specify a ease like that of the claimant. Let it be remembered that he was assigned to duty in the Bureau April LI, 1867; was on duty when that act was passed January 21, 1870; was still on duty when he was placed on the retired list December 15,1870; and remained on duty, without any new assignment to it, till he was arrested for trial in the autum of 1872.
The act prohibited future assignments of retired officers to duty; which did not touch the claimant’s case; for he was not assigned to duty after the act was passed.
The act declared that all assignments of such officers to duty, which had been made before its passage, should terminate within thirty days thereafter. Neither did this touch the claimant’s case; for when he was assigned to duty, and also when the act was passed, he was on the active list.
Such being the case, we can see how it might well be questioned, if necessary, whether the act at all reached the case of an officer retired nearly eleven months after its passage, at a time when he was on duty, and was simply allowed to continue on that duty. But it is not necessary to the decision of the' matter now under consideration, that we should decide that point one way or the other. There is another view of the subject which, in our judgment, settles this question.
This objection is founded on the assumed fact, that the offenses charged against the claimant, and of which he was convicted, were committed after he was retired, and therefore that the court had no jurisdiction of them. If this were wholly true in fact, we might have to meet the question now raised, but it is not wholly true. Under charge I, there were two specifications (the 1st and 5th), and under charge II, there was one (the 14th), each averring acts done by him in 1870, before he was retired; and of those three specifications he was found guilty, as he was also of both charges. This was enough to uphold the sentence of the court, for those specifications related to a time when there was not the least ground for disputing the right of the court to try him on them under those charges.
*414 Furthermore: By section 18 of the act of August 3, 1861, u providing for the better organization of the military establishment,” (12 Stat. L., 287, ch. 42), it is declared that officers of the Army “ partially retired,” that is, “ placed on the list of retired officers,” ashall be subject to the rules and articles of war, and to trial by general court-martial for any breach of said articles; ” and Article 83, in force when the claimant was tried, said that—
“Any commissioned officer convicted before a general court-martial of conduct unbecoming an officer and a gentleman, shall be dismissed the service.”
So, as a retired officer he was subject to be tried by a court-martial; and as to the second charge, it was not at all necessary to his conviction, that the “ conduct unbecoming an officer and a gentleman,” should have been shown when he was on duty. Winthrop’s Digest (p. 39) says on this point:
“It is not necessary that the act or conduct of the officer should be immediately connected with or should directly affect the military service. It is .sufficient that it is morally wrong and of such a nature that, while dishonoring or disgracing him as a gentleman, it compromises his character and position as an officer of the army.”
Tbis disposes of the last of the claimant’s objections to the jurisdiction of the court-martial. We decide against'them all, and pass to other and graver matters.
As we have seen, the 65th Article of War provided that no “ sentence of a general court-martial, in the time of peace, extending tothe .... dismission of a commissioned officer . . . . shall be carried into execution, until after the whole proceedings shall have been transmitted to the Secretary of War, to be laid before the President of the United States for his confirmation, or disapproval, and orders in the case.”
The proceedings of the court in the claimant’s case were transmitted to the Secretary of War during the Presidency of Ulysses S. Grant, and on the I6th of January, 1873, the Secretary wrote thereon the order set forth above in this opinion.
The question is, whether by this order it appears that President Grant confirmed the sentence of the court. The claimant contends that it does not, and insists that the supposed confirmation was merely the act of the Secretary, and not that of the President, and so was no confirmation at all. It cannot be denied that this raises a question of no ordinary significance in *415 the administration of military law; but we think it not of very great weight.
In the first place, it is important to note that there is not, nor ever was, any law requiring the President’s confirmation of the sentence of a court-martial to be attested by Ms sign manual.
In the next place, referring to the act of August 7, 1789, “ to establish an Executive Department, to be denominated the Department of War,” (1 Stat. L.' 49,) substantially retained in section 216 of the Revised Statutes, we find that the Secretary of War is to perform and execute such duties as shall be enjoined on or entrusted to him by the President relative to'the land or naval forces, and to conduct the business of the War Department in such manner as the President shall, from time to time, order and instruct.
We need not discuss the relations established between the President and the Secretary of War by that act; for that matter was long ago settled by the Supreme Court of the United States, and w'e have only to refer to its rulings.
In Wilcox v. Jaelcson, (13 Peters, 498,) the question was, whether an order of the Secretary of War directing certain public lands to be reserved for military purposes, was authorized under a statute declaring all lands exempted from preemption which are reserved from sale by order of the President. The Supreme Court held the order of the Secretary of War to be, in law, that of the President, and the opinion of the court uses this language:
“Although the immediate agent in requiring this reservation was the Secretary of War, yet we feel justified in presuming that it was done by the approbation and direction of the President. The President speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties. Both military posts and Indian affairs, including agencies, belong to the War Department, Hence we consider the act of the War Department in requiring this reservation to be made, as being in legal contemplation the act of the President; and consequently, that the reservation thus made was in legal effect a reservation made by order •of the President, within the terms of the act of Congress.”
In United States v. Eliason, (16 Peters, 191,) the question was, whether a regulation promulgated by tbe War Department was the act of the President; and the court said:
“The Secretary, of War is the regular constitutional organ *416 of the President for the administration of the military establishment of the nation; and rules and orders promulged through him must be received as the acts of the executive, and, as such, be binding upon all within the sphere of his legal and constitutional authority.”
' After these decisions it cannot, in this court at least, be considered an open question, whether an approval of the proceedings and sentence of a court-martial, announced by an order of the Secretary of War, as in this case, is to be regarded as the act of the President.
It is not without use, in this connection, to refer to army precedents in like cases. We have obtained from the Department of Justice a copy of an unpublished opinion given June 6,1877, by Attorney General Devens to President Hayes in regard to* the case of the claimant; from which, with the permission of the head of that Department, we make the following extracts, embodying historical facts of interest and value:
“It is remarked by Major Bunkle’s counsel, in a printed argument filed with the papers, that ‘ all of our earlier Presidents-signed the approval of such sentences, and it is believed that it was only during the last Administration that the contrary practice prevailed.’
“ But I have before me several instances of the ‘ contrary practice’ happening prior to 1860, one of which occurred nearly half a century ago.
“Thus, in the case of First Lieut. William S. Oolquhoun, Seventh Infantry, who was tried by court-martial and sentenced to be cashiered in 1829, the determination of the President (which confirmed the sentence, except as to the disqualification from thereafter holding any office in the Army) was signified through the Secretary of War, Mr. Baton, in a statement signed by the latter, purporting to be ‘ by command of the President.’'
“ So, in the case of First Lieut. B. M. Cochrane, Fourth Infantry, who, in 1844, was sentenced to be cashiered by a court-martial, the determination of the President, confirming the-sentence, was signified through the Secretary of War, Mr. Wilkins. Here the latter made known the action of the President by indorsing upon the record of the proceedings and signing the following brief statement: 1 The proceedings, findings, and sentence of the court are approved. November 28,1844.’
“ So, in the case of Maj. George B. Crittenden, Mounted Biflemen, who was sentenced to be cashiered by a court-martial in 1848, the determination of the President, confirming the sentence, was announced through the Secretary of War, Mr. Marcy,. by a statement indorsed upon the record, and signed by the latter, which reads thus: ‘ The President approves of the pro *417 ceedings and sentence in the case of Major Crittenden, and directs the proper order to be issued thereon.’
“ So, in the case of Brevet Lieut. Col. William R. Montgomery, major Second Infantry, who in 1855 was sentenced by a court-martial to be dismissed the service, the determination of the President, confirming the sentence, was in like manner signified through the Secretary of War, Mr. Davis.
“ So, in the case of First Lieut. John N. Perkins, First Cavalry, who in 1859 was sentenced by a court-martial to be cashiered, the action of the President confirming the sentence was in like manner signified through the Secretary of War, Mr. Floyd.
“ I am informed by inquiry at the office of the Judge-Advocate-Gen eral that numerous instances have occurred, since the case last mentioned, in which the determination of the President, confirming sentences of dismissal by courts-martial, has been signified and attested in the same way.”
We might go further and point to what seems to us to be incontrovertible internal evidence in Secretary Belknap’s order of its expressing not his, but President Grant’s decision; but this opinion has been extended to such length, that we forbear to discuss that subject. Our unhesitating judgment is, that the findings and sentence of the court were legally confirmed by President Grant, and that from the date of the official promulgation of their confirmation the claimant ceased to be an officer of the army.
The final question raised by the claimant is connected with the action of President Hayes, in his order of August 4, 1877, disapproving the sentence of the court-martial, and revoking General Order No. 7 of the War Department.'
Proceeding upon the assumption that “W. W. Belknap, Secretary of War, approved the proceedings of said court, and thereupon caused General Order No.- 7, series of 1873, to issue from the War Department,” President Hayes, as appears in his order, caused the record to be laid before himself, and “having carefully considered the same,” was “ of opinion,” [not that the court was without jurisdiction to try the claimant, but] “ that the said conviction is not sustained by the evidence in the case;” and thereupon disapproved the'conviction and sentence, and revoked General Order No. 7.
Was this a lawful exercise of the executive -power vested in him as President of the United States? We are clear in the conclusion that it was not. No such authority is expressly conferred upon him by statute, nor is it by any constitutional *418 definition of his powers, nor can it be legitimately inferred from any written law.
The only revisory power over the proceedings of courts-marshal vested by law in the Executive, when President Hayes took the action referred to, was that conferred by the 65th Article of War, and that was simply “to confirm or disapprove.” Either confirmation or disapproval in such a case is a single and isolated act, intended to produce a single effect, -absolute in its purpose and result, complete when it is done, and with no authority vested in the Executive, by any written law, to recall, revoke, or modify the official act of confirmation or disapproval. Wherever a naked power is given to a public officer to do a single particular act in a single defined case, it may be laid down as an axiomatic rule, that when the act is once done the power is exhausted. Take, for instance, the President’s right to approve a bill passed by Congress, — a single act complete in itself: has it ever been dreamed that after a bill had been approved and placed in the national archives, the approval could be retracted ? And yet why not, if the President may revoke the approval of a court-martial’s sentence? And if he can set aside an executive confirmation of a conviction and sentence, why may he not annnl an executive disapproval of them, and require the sentence to be executed? If he can revoke a confirmation by his immediate predecessor, why not one made by any preceding President ? If he can, as in this case, go back and take up a sentence that had been confirmed and executed more than four years and a half before, and revoke it, why not do so after the lapse of any number of years? But we need not press questions or illustrations further. Our judgment is, that the act of President Hayes, purporting to revoke the sentence which President Grant had confirmed, was without authority of law, null, and void, and therefore could not possibly confer any right on the claimant to restoration to the army.
If anything more were needed to sustain this view, it could be found in the fact that, when President Hayes’s order was made, the number of officers on the retired list allowed by law, to wit, three hundred, was full, and there was therefore no place on that list for the claimant; and he was, without authority of law, borne on the army records, as additional to *419 that number, until November 19, 1877, when a vacancy occurred.
If our conclusions be correct, it necessarily follows that the claimant cannot recover longevity pay in this suit, because his claim for it must be based on his being in office de jure, as well as defacto. When he sues here for that pay, he asserts a legal right; which, of course, cannot be sustained by mere occupancy of the office, but must be upheld by a legal title to it, or no judgment in his favor for the pay of the office can be rendered. (People v. Tieman, 30 Barbour, 193; People v. Hopson, 1 Denio, 574; People v. Nostrand, 46 New York, 375; Dolan v. Mayor, 68 Ibid., 274; Riddle v. Bedford, 7 Serg. & Rawle, 386; Dorsey v. Smyth, 28 California, 21; Stratton v. Oulton, Ibid., 44; Carroll v. Siebenthaler, 37 Ibid., 193; Meagher v. Storey, 5 Nevada, 244.)
The only remaining matter to be disposed of is the defendant’s counter-claim for all the money received by the claimant as pay since his supposed restoration to the army on the 4th of August, 1877, shown by the findings to have been $23,585.62 from that date up to January 1, 1884.
Of this sum, $9,195.27 was received by him from army paymasters, for the period from January 16, 1873, to August 4, 1877, during all of which time we hold him not to have been in the army at all, either de jure or de facto.
As appears in the findings, that money was paid him by the express order of President Hayes. That order, of course, justified the paymasters in making the payment; but did it preclude the United States from asserting the illegality of the order? We are of the opinion that it did not. If we are right in holding President Hayes’s order of August 4, 1877, to have been illegal, null, and void, then, inevitably, his order that the claimant should be paid for the time he was out of .the army was equally illegal, null, and void.
In regard, however, to the pay received by the claimant for the time between August 4, 1877, and January 1,1884, a different question is presented. By the act of the President the claimant, so far as the executive departments of the government were concerned, was restored to his place in the army, and was an officer de facto, though; if our views herein expressed be correct, he was not so de jure. In the cases of Miller, Montgomery, and Palen, just decided, we have held, that *420 pay received by a defacto officer, cannot be recovered back by the government, and we so hold in this case. So much, therefore, of the counter-claim as includes the sum of $14,390.35, is disallowed.
The decision of the court is, that the claimant is not entitled to recover any longevity pay; that the defendants are not entitled to recover $14,390.35 of the counter-claim ; but are entitled to recover the remaining $9,195.27; and judgment will be entered accordingly.
Nott, J., read an opinion in the case of Lieutenant Miller (ante), and, the two being decided on the same day, his opinion in Miller’s case was likewise entitled and filed as his opinion in this.